[Civil No. 4680. Filed November 19, 1945.]

[163 Pac. (2d) 685.]

E. F. GARLINGTON, Appellant, v. CHARLES S. SMITH, CHARLES C. BRADBURY, EDWARD J. GOTTHELF, J. H. PATTERSON and GEORGE O. BASSETT, as Members of and Constituting the BOARD OF MEDICAL EXAMINERS OF THE STATE OF ARIZONA, Appellees.

Mr. W. H. Chester, Mr. Herbert Watson, for Appellant.

Mr. John L. Sullivan, Attorney General; Mr. J. Hubert Smith, Assistant Attorney General, for Appellee.

STANFORD, C. J.—Plaintiff was charged in the District Court of the United States for the District of Arizona in three counts with the crime of violating the Harrison Anti-Narcotic Act, 26 U. S. C. A. Int. Rev. Code, §§ 2550 *et seq.*, 3220 *et seq.* He thereafter entered a plea of guilty to the third count, being the selling of

morphine to Ernesto Sierra, "the said Ernesto Sierra not being then and there a patient of the said E. F. Garlington, and the said morphine was then and there dispensed and distributed by the said E. F. Garlington not in the course of his professional practice only." The State Board of Medical Examiners of the State of Arizona, after his plea of guilty, and before the expiration of two years, issued a citation and complaint against the plaintiff requiring him to appear before said Board on April 2, 1941, and to show why his certificate to practice medicine and surgery should not be revoked for acts of unprofessional conduct. After hearing the board revoked the license of plaintiff. Thereafter plaintiff filed his action in the superior court to show cause why the Board's action in respect to plaintiff should not be set aside on *certiorari* or reversed on appeal. Said court, by its judgment, sustained the decision and order of defendants, the State Board of Medical Examiners, in revoking and canceling the license of plaintiff to practice medicine and surgery in the State of Arizona. From that judgment this appeal is taken.

It is the claim of plaintiff before this court that the Board of Medical Examiners had no jurisdiction for the cancellation of his license for the reason that the defendants had only the authority granted to them under the act creating their board; that the board was created by the act of the Legislature, Senate Bill No. 167, Chapter 99, Session Laws of Arizona 1935, and that by reason of that act the old medical board, as set up in the Code of 1928, was dissolved, and a new board created having only the power provided for in the act that created the board; and that the effect of the creation of the new law in 1935 was to drop the provisions of prior laws including the power to revoke or cancel licenses or give examinations.

Plaintiff relies on the case of *Donaldson* v. *Sisk,* 57 Ariz. 483, 114 Pac. (2d) 907, 909. While he does not quote particularly from that case we quote an important sentence: ''While the new commission takes over the functions of the old one in great part it is, as a matter of law, a separate and distinct entity, governed solely by the Act which created it, and we can look only to that Act to determine its powers, duties and limitations. . . . '' We consider this case which involves the matter of the Unemployment Compensation Commission of Arizona quite different from the case before us.

In our case of *Marlar* v. *Patterson,* 60 Ariz. 240, 135 Pac. (2d) 218, 221, we said:

''The Medical Practice Act was amended in 1935, chapter 99, session laws of that year, and we are unable to see why the plaintiff claims that they made the board of examiners merely a board of registration. The first change made deals with the make-up of the board and the length of term each shall serve, and the second made the practice of medicine without having a valid recorded certificate a felony instead of a misdemeanor. Then there was added a section providing that every person practicing medicine, surgery or osteopathy in the state shall renew his license each year by the payment of $3 on or before January 1st. Clearly these amendments had no effect whatever on the other provisions of the Medical Practice Act.''

Under that opinion other provisions of the Medical Practice Act as termed by the Marlar-Patterson case, *supra,* and as now carried forward in our Code of 1939, is, with the exception of those amendments, still intact. Our Sec. 67–1106, Arizona Code Annotated 1939, under the heading of ''Refusal of certificate—Revocation—Hearing by board—Unprofessional conduct defined,'' contains these words:

'' . . . Whenever a holder of a certificate is guilty of unprofessional conduct, or whenever a certificate has been procured by fraud or misrepresentation, or issued

by mistake, the board shall revoke the same after citation and hearing thereon. . . . ''

''The words 'unprofessional conduct' shall include . . . conviction of any offense involving moral turpitude, . . . ''

██ In respect to the words ''Moral turpitude'' the case of *Speer* v. *State* (Tex. Civ. App.), 109 S. W. (2d) 1150, 1154, has this to say:

''In the next place, that moral turpitude inhered in the acts from which the conviction resulted is a legitimate, if not inevitable, inference; appellant's naive argument to the contrary upon this feature presents that, since the Harrison Narcotic Act is a revenue measure only, a violation of it does not constitute a crime involving moral turpitude; but, while the concession may be freely made that it does have that character in so far, perhaps, as may be necessary to uphold the power of Congress under the Constitution in enacting it, its further and underlying purpose is to regulate and control the sale of narcotics in consonance with a widespread feeling that it is not good morals to sell such dangerous drugs except in pursuance of the professional ministrations of a physician in treating patients; that view of it was taken by Justice Holmes in *United States* v. *Jin Fuey Moy,* 241 U. S. 394, 36 Sup. Ct. 658, 659, 60 L. E. 1061, Ann. Cas. 1917D, 854, when he said 'It may be assumed that the statute has a moral end as well as revenue in view.' . . . ''

██ The plaintiff's hearing before the board appears very regular. A stenographer took down the testimony and this plaintiff, himself, testified, together with several others. The whole of this case is well treated in our own case of *Du Vall* v. *Board of Medical Examiners of Arizona,* 1937, 49 Ariz. 329, 66 Pac. (2d) 1026, 1029. We quote the following from said case:

'' . . . The proceedings before the board are more or less informal. If the accusation is sufficient to advise the party charged of the nature and character of the charges so that he may prepare himself to defend thereon, it is sufficient.''

"We think a conviction under the Harrison Narcotic Act negatives any and all presumptions of good faith on the part of the defendant and brands him as a person of bad moral character, unfit to practice medicine. Because of the appropriateness of the language in *Hawker* v. *State of New York,* 170 U. S. 189, 18 Sup. Ct. 573, 576, 42 L. Ed. 1002 we quote as follows:

" 'It is not, as a rule, the good people who commit crime. When the legislature declares that whoever has violated the criminal laws of the state shall be deemed lacking in good moral character, it is not laying down an arbitrary or fanciful rule, one having no relation to the subject-matter, but is only appealing to a well-recognized fact of human experience; and, if it may make a violation of criminal law a test of bad character, what more conclusive evidence of the fact of such violation can there be than a conviction duly had in one of the courts of the state? The conviction is, as between the state and the defendant, an adjudication of the fact. So, if the legislature enacts that one who has been convicted of crime shall no longer engage in the practice of medicine, it is simply applying the doctrine of *res judicata,* and invoking the conclusive adjudication of the fact that the man has violated the criminal law, and is presumptively, therefore, a man of such bad character as to render it unsafe to trust the lives and health of citizens to his care.' "

■■ Among other points raised by the plaintiff is that Dr. Charles S. Smith, a member of the Board, was absent from the first meeting. The record before us shows that on July 2, 1941, the date of the revocation of the license of plaintiff, Dr. Smith left his proxy with the secretary just before the meeting. This proxy was ineffective. No board member may delegate his powers. The record still further shows that by motion made by one of the members of the board, and seconded by another, "it was unanimously voted to revoke this man's license for unprofessional conduct." Under the law there are five members of this board. A majority could legally revoke the license of the plaintiff.

The other points raised by the plaintiff, we do not feel require the action of this court.

The judgment is affirmed.

LaPRADE and MORGAN, JJ., concur.